# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 1, 2008 Session

## STATE OF TENNESSEE v. ANTHONY PHILLIP GEANES

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 06-01-0215     J. Weber McCraw, Judge**

-----

**No. W2007-02223-CCA-R3-CD  - Filed November 24, 2008**

-----

ALAN E. GLENN, J., dissenting.


I respectfully dissent from the majority opinion in this matter. As I will explain, I believe that the cases relied upon by the majority are distinguishable upon the facts from those presented by the present appeal.

Although the facts have been fully set out in the majority opinion, I will repeat those which are salient to this dissenting opinion.

Mike Kennamore, an investigator for the Hardeman County Sheriff's Department, testified that the defendant's home was directly across the street from that of the victims. He described that area as "highly populated, just house after house," on "[b]oth sides of the road, and also on the next street over, on . . . old Highway 125 it's steady houses." During his testimony, he identified a photograph of the area showing the street and the victims' house. The photograph shows that the street is narrow, the yards small, and the houses close together. He said that the houses of the defendant and the victims were "pretty much straight across from each other and the driveways are close to matching up." One of the victims, Tameka Woods, testified that she saw the defendant "shooting in the air . . . [m]aybe two or three times." Thus, the State's proof established that the defendant fired a pistol at least once in a "highly populated" area.

The majority relies upon State v. Fox, 947 S.W.2d 865, 865 (Tenn. Crim. App. 1996), wherein the indictment stemmed from the defendant's acts of "discharging a pistol into the air or up into a tree." There was no testimony that anyone was either in the tree being fired upon or outside the apartment building in the immediate vicinity of the defendant:

> We find the [defendant's] mere discharge of a weapon into the air or up into a tree top did not "place another person in imminent danger of death or serious bodily injury." Merely discharging a gun, standing alone, is not sufficient to constitute commission of reckless endangerment. See People v. Richardson, 97 A.D.2d 693,

468 N.Y.S.2d 114 (1983) (holding discharge of gun into air does not constitute reckless endangerment). The discharge must create an imminent risk of death or serious bodily injury to some person or class of persons.

Id. at 866. The court in Fox concluded that the facts did not support a reckless endangerment conviction. Id.

In State v. Payne, 7 S.W.3d 25, 26 (Tenn. 1999), another case relied upon by the majority, the defendant, in his vehicle, fled from a police officer who sought to question him as to why the license tag on his car was registered to another vehicle. During the chase, the defendant made a U-turn and drove his car into the path of the officer's patrol car. The officer managed to avoid a collision and pursued the defendant through a residential area until the defendant turned off his headlights and successfully eluded capture. Id.

Four days later, the defendant was spotted in the same neighborhood by other officers. Refusing to get out of his vehicle although ordered to do so, the defendant drove away as an officer tried to reach into the vehicle to prevent his leaving. The officer held "onto the car for a brief time before letting go." Id. The officers then pursued the defendant's vehicle through a residential neighborhood, as he ignored both the speed limit and stop signs. Officers testified that people were present on the sidewalk during the chase and that twice the defendant made a U-turn, driving directly at them and causing them to swerve to avoid being struck by his vehicle. The defendant drove around a car which had stopped for a traffic light and, although being pursued by officers driving between 55 and 60 miles per hour, evaded the officers. A witness testified that he pulled his vehicle to the side of the road to avoid being struck by the defendant and saw the defendant pull his vehicle into the opposite lane, striking another car, killing one passenger and injuring the other three people in the vehicle. Id. at 27. An issue on appeal was "whether the offense of reckless endangerment can be committed against the public at large." Id. Our supreme court decided this issue in the affirmative, explaining the "zone of danger":

> We hold that the term "zone of danger" may be employed to define that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area. We further hold that the term "public at large" may be used in an indictment for reckless endangerment to designate that class of persons occupying the "zone of danger." Accordingly, the indictment in the case now before us was not erroneous for employing the term "public at large."

Id. at 28.

Concluding that the State had failed to prove that any members of the public at large were endangered during the first chase, the court explained how the State might have met its burden of proof in this regard:

The State could have met its burden by showing that at the time of the chase another motorist was driving on the street or that an individual was walking down the sidewalk. The State simply failed to show that anyone other than [the police officer] was located in the area in which a reasonable probability of death or serious[] bodily injury existed.

Id. at 29.

The "zone of danger"concept set out in Payne later was applied by this court in State v. Kenneth Buford, No. E2004-01780-CCA-R3-CD, 2005 WL 1488578 (Tenn. Crim. App. June 23, 2005), where the defendant fired a pistol into the air, away from the street or occupied buildings:

[Officer] Hopkins explained that the club is between 250 and 300 feet from Austin Homes and that shots fired from Club Temptations could "absolutely" be heard from Austin Homes. Additionally, Hopkins explained that the club's parking lot is between fifty and seventy-five feet from McCalla Avenue, a public thoroughfare. He stated that, in his experience, after a weapon is fired, people nearby become fearful and nervous. He further stated that gunshots increase the possibility that other armed individuals may draw a weapon in defense of themselves. In sum, he stated that such circumstances "make[ ] for an extremely unsafe situation."

Id. at *1.

The Buford court concluded that the facts could not sustain a conviction for reckless endangerment:

[T]he testimony established that the defendant fired the gun into the air, away from both the street and any buildings in the vicinity that could have been occupied. Therefore, the instant facts are analogous to Fox and are distinguishable from other cases in which we have sustained convictions for reckless endangerment.

Id. at *4 (citations omitted).

In my opinion, the facts presented by this appeal are easily distinguished from the holdings in Buford and Fox. In Buford, the defendant fired his weapon "into the air, away from both the street and any buildings in the vicinity that could have been occupied," 2005 WL 1488578, at *4; and, in Fox, the pistol was fired "into the air or up into a tree," with "no testimony that anyone was either in the tree being fired upon or outside the apartment building in the immediate vicinity of the appellant," 947 S.W.2d at 865. In the present case, the defendant fired a pistol into the air at least once during the evening hours in a "highly populated" area, where the street was narrow and the houses close together. His shot sent scattering the people on the front porch of the house across the street. In my opinion, this evidence clearly was sufficient to show that others were in the "zone of danger" created by the defendant's firing his pistol into the air, and, for reasons explained by our supreme court in Payne, I would affirm the conviction.

_____
ALAN E. GLENN, JUDGE